Ex parte MIKELL.

(District Court, E. D. South Carolina. October 29, 1918.)

1. HABEAS CORPUS ⚖1, 53—NATURE—PETITION—SUFFICIENCY.

The writ of habeas corpus is of the highest remedial character, intended to summarily protect the liberty of the citizen from unlawful detention, and the petition is of informal character; a simple application, stating that the party is unlawfully confined, being in most cases sufficient.

2. HABEAS CORPUS ⚖53—PETITION—SUFFICIENCY.

A petition for habeas corpus, stating that petitioner was unlawfully and wrongfully confined under order of the commander of a military camp, etc., *held* sufficient.

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. STATUTES ⚖️═219—CONSTRUCTION BY SECRETARY OF WAR.
The construction placed by the Secretary of War on article 2, Articles of War (Rev. St. § 1342, as amended by Act Aug. 29, 1916 [Comp. St. 1916, § 2308a]), is not conclusive; but the construction is for the courts specially, in so far as it affects the relations between the armies and civilian population.

4. WAR ⚖️═32—MILITARY LAW—CIVILIAN EMPLOYÉS—"IN THE FIELD."
A civilian stenographer, employed as a clerk during war at a camp or cantonment in the United States, is not subject to military law, under article 2, Articles of War (Rev. St. § 1342, as amended by Act Aug. 29, 1916 [Comp. St. 1916, § 2308a]), for he is not serving with an army in the field, there being no hostilities in the United States; and this is true, despite the language of Act April 16, 1918.

[Ed. Note.—For other definitions, see Words and Phrases, In the Field.]

Application by William E. Mikell for habeas corpus. On rule to show cause. Application granted, and writ issued.

H. N. Edmunds, of Columbia, S. C., for petitioner.

Wm. L. Martin, Capt. F. A., Judge Advocate, M. J. Dougherty, 2d Lieut. F. A., Asst. Judge Advocate, and J. Waties Waring, of Charleston, S. C., Asst. U. S. Atty., for Maj. Hines.

SMITH, District Judge. In this matter an application was presented on behalf of the petitioner, William E. Mikell, on the 10th of October, 1918, stating that he was unlawfully and wrongfully confined in imprisonment under the orders of the commanding officer of Camp Jackson, near Columbia, in this district, of which camp the commanding officer was Brig. Gen. Robert M. Danford, and that the police department was in charge of Maj. F. H. Hines, under whose particular charge the applicant was.

On reading the petition, it appeared to the court that the better practice would be, in lieu of issuing a writ nisi at this time, to issue a rule, so it might appear whether the case was a proper one in which a writ should issue, without going to the expense at this time of having the applicant transported from the place of his confinement, and brought before the judge, in the city of Charleston, S. C.

An order to show cause was thereupon issued on the 10th day of October instant, requiring Brig. Gen. Robert M. Danford, in command at Camp Jackson, or Maj. F. H. Hines, in command of the police department of the camp wherein the applicant alleged that he was unlawfully confined, to show cause before the court on the 19th day of October, 1918, at 12 o'clock m., why a writ of peremptory habeas corpus should not issue forthwith from this court.

This rule and a copy of the application were duly served, and on the 19th day of October, at the appointed hour, Maj. F. H. Hines, as the party having possession of the body of the applicant, appeared before the court, and filed a demurrer, and return, and the cause was thereupon heard fully; counsel appearing both for the applicant and for the respondent, Maj. Hines.

[1] The demurrer interposed is hereby overruled. The petition for a writ of habeas corpus has always been of an informal character.

⚖️═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The writ of habeas corpus is a writ of the highest remedial kind, intended to summarily protect the liberty of the citizen from unlawful detention; and a simple application to the court, stating that the party is unlawfully confined, is in most cases sufficient.

[2] The petition in this case, in the opinion of the court, was ample to advise the respondents that the petitioner claimed that they had him in their physical possession and were unlawfully detaining him, and for the circumstances of this case that would seem to be sufficient. It appears from the admitted facts of the return of Maj. Hines and the statements made in open court, agreed to by the counsel for both sides, that the applicant, William E. Mikell, is not and never has been in the actual military service of the United States.

[3, 4] It appears that on July 22, 1917, he was employed by the military authorities at Camp Jackson, Columbia, S. C., in the capacity of a stenographer. Thereafter, about March, 1918, upon his application, he was employed by the constructing quartermaster of Camp Jackson in the position of field auditor. The scope of that employment was that he was to audit or check up the vouchers and accounts of a contractor, or contractors, engaged in the construction of work of a constructive kind, at Camp Jackson. On September 25, 1918, he was discharged from the employment of the government, and arrested by the military authorities on charges that he had rendered false and fraudulent claims against the United States, or connived and colluded with the rendering of false and fraudulent claims against the United States. Thereupon, by the military authorities, he was arrested and placed in confinement in the military prison stockade at Camp Jackson, and the said authorities refused to release him, and propose to try him by court-martial.

The question therefore is: Is he subject to trial by court-martial, or is he entitled to a trial in the courts of the land of competent jurisdiction for any crime that he may have committed? The contention of the counsel for the respondents is that he is subject to the jurisdiction of the military authorities and trial by court-martial.

This is based upon the language of section 1342 of the United States Revised Statutes, as amended by Act August 29, 1916, c. 418, § 3 (Comp. St. 1916, § 2308a), declaring what shall be the Articles of War, at all times and in all places governing the armies of the United States (39 Statutes at Large, p. 650). Article 2 of the Articles of War thereby enacted refers to persons subject to military law; and subdivision (d) of that article is as follows:

"All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

The position of the counsel for the respondents is that William E. Mikell is a person serving with the armies of the United States "in the field," and as such is subject to military law. For this respondents cite the construction claimed to have been put upon this clause by the Secretary of War, and maintain that such construction is con-

clusive. Such a contention could not be admitted by this court for a moment. The construction of the meaning of a statute of Congress is for the courts of the land, especially in so far as it affects the relation of the armies of the United States, with the rest of the people of the United States. The construction of the Secretary of War may be held as applicable in all matters among persons controlled by the Articles of War, or regulations thereunder, within the scope of the authority given him; perhaps it may be said, also, in matters where third persons are concerned, where the matter is limited to the question of what is the rule under the Articles of War among persons admittedly subject to the Articles of War. In all matters, however, pertaining to the people at large and to the effect of the language contained in the statute with relation to people who are not admittedly subject to military law, any construction put by the Secretary of War on the statute has no more effect than the opinion or the construction given by an individual. It may be persuasive in argument to the court as the construction given by a person acquainted with the subject, but it has no controlling effect whatsoever.

Were the authority given to the President himself to make rules and regulations upon any subject, he might conclusively construe his own rules and regulations; but the question whether the subject-matter was within the scope of his authority, or subject to his rules and regulations, would still be a judicial one. Under the Constitution of the United States, the departments are wholly distinct, and the question as to what is the law is a distinctively judicial one.

The construction of the language of an act of Congress is for the courts of law, and where a lower court may err in its construction, this is to be corrected by an appeal to the higher. Were it otherwise, the mere construction of the Secretary of War might render the provisions of the Articles of War applicable to the entire people of the United States, upon the theory that his construction is to govern.

The question, thus, for the court to determine upon this investigation, is whether William E. Mikell is, under the language of the statute in subdivision (d), just quoted, a person subject to military law, and therefore to be tried by court-martial. This is to be ascertained by the ordinary rules of construction, adopted and followed by courts of competent jurisdiction; and a glance at the language of the article will show that practically the whole question depends upon the meaning of the words "in the field"; that is to say, whether "in the field" means in the field of war or hostilities, or whether it means anywhere in the United States, at which there may be a military camp or post of the armies of the United States.

An examination of the language of this subdivision alone is instructive. The first clause covers a period when the country may be at peace. It provides that all retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States shall be subject to the Articles of War. Then comes the next clause, which is limited to a period when the country may be at war, and declares that in time of war all such retainers and persons accompanying or serving

with the armies of the United States "in the field," both within and without the territorial jurisdiction of the United States, are subject to those articles.

There is no doubt that the present is a time when this country is at war. Now, is a camp or cantonment of the United States, within the state of South Carolina, a place where the armies can be said to be "in the field"?

The ordinary meaning of the words "field," or "in the field," with regard to military operations, mean in the actual field of operations against the enemy; not necessarily the immediate battle front, nor necessarily the immediate field of battle, but the field of operations, so to say; the field of war; the territory so closely connected with the absolute struggle with the enemy that it is a part of the field of contest.

The word "field" is sometimes figuratively and poetically used to mean the actual struggle itself; as you would say, a man exerted himself stoutly "in the field," which would mean that he did so in the actual conflict. It is sometimes used, also, to denote the wider sphere or area of strategy, where you speak of "strategy of the field," but always in connection with some direct antagonistic effort against the adversary. It would never be used ordinarily, so to say, to mean the territory of either warring party, wholly and entirely removed from the scene of hostilities. The British armies in South Africa during the Boer war were trained and prepared in Great Britain, but, whilst in preparation in Great Britain, no one would have spoken of them as "in the field."

In case of internecine conflict, such as the late War between the States, or of an armed rebellion, then there might be an actual field of combat, or of hostile operations, within the territorial jurisdiction of the United States and in such case, as to all persons serving with the armies of the United States, within its territorial jurisdiction, in close enough contiguity to its armies to be a part of the general war operations, they might be said to be serving in the field.

Even, however, within the territorial jurisdiction of the United States, it has never been maintained that during the War between the States, when the battle field extended from Virginia to Louisiana, a person on the Pacific Slope could be said to be serving "in the field." To so hold would be to mean that the entire United States—that is to say, its entire territorial jurisdiction—was "in the field," for camps and cantonments may be scattered over the entire United States.

The operations of furnishing to and serving in those camps are co-extensive with the territorial limits of the United States. A train full of soldiers may leave a distant point in Idaho or Montana for a training camp in Maine or Florida. Is the engineer or the trainmen who conduct that train in the position of persons or retainers serving "in the field"? Manifestly not.

The court cannot but hold the conclusion unreasonable that, with a battle front 3,000 miles away, separated by an immense ocean from the United States, with peace within all the territorial limits of the United States, with martial law nowhere prevailing therein, and with all of the courts of the country open for the administration of public

justice, all people in any way connected with or doing work for a military official or camp of the United States in this country may be claimed to be serving "in the field."

For the construction of the language of the act of August, 1916, as presumptively furnishing a guide to the court as a statute passed in pari materia, reference is made by counsel for respondents to Act April 16, 1918, c. 53, entitled "An act to provide quarters or commutation thereof to·commissioned officers in certain cases." This last act would not strictly be an act in pari materia, as to aid in the construction of the words "in the field." The act of August, 1916, is one which regulates the relations of citizens generally with regard to the Articles of War. The act of April, 1918, was simply to make suitable provision for officers by allowing certain commutations. Even so, the language leaves the matter wholly unaffected. The last act reads:

"During the present emergency every commissioned officer of the army of the United States, on duty in the field, or on active duty without the territorial jurisdiction of the United States, who maintains a place of abode for a wife, child, or dependent parent," etc.

It is at least ambiguous whether the words "in the field" there are not to be used in connection with the 'words "or on active duty," so as to mean in the field within the territorial jurisdiction of the United States, or in the field, which now imports being without the United States as well as being on active duty (although not in the field) without the United States. In the printed copy of the statute, there is no comma after the words "or on active duty"; so it may be said this is ambiguous, but in any event it would leave it as it stood before. It is definite neither way.

This act, as quoted by respondents in their brief filed, appears to be quoted erroneously, as it has the words "on active duty *within* the territorial jurisdiction of the United States"; whereas the printed statute has it "*without* the territorial jurisdiction of the United States."

The respondents further cite and· rely upon the case of Ex parte Gerlach (D. C.) 247 Fed. 616. In that case, Gerlach, an employé of the United States Shipping Board, went to Europe as mate on the steamship McClellan, a vessel in use as a military transport. He was discharged in Europe and sent back on the vessel El Occidente, an army transport, to New York, but volunteered to stand watch and for several days did this, but finally refused to continue. For this disobedience to the order of the army officer in command of the transport, he was tried by court-martial and sentenced to five years' imprisonment.

In the first place, the Gerlach Case was very different in the facts from this case. Gerlach was on the ship, which was a ship of the United States, in command of an officer of the United States, and had volunteered to act in the performance of military service of a naval character while on board of that ship. In the present case, the applicant, Mikell, is admittedly a civilian. He has never occupied any military position, or expressly entered into any military service. The duty he was performing was of a purely civil character. He was simply acting as an auditing clerk to check up the vouchers and accounts of a civilian

contractor, who was employed by the government to do construction work. He was no more in the military service than was the contractor who might be employed to do the construction work. He was working for the United States, perhaps; but his connection with the military forces of the United States was only under the military department of the United States, which was used in this construction work by the government for the purpose of attending to the supervision of that construction and the disbursement of the moneys to be paid for it.

The military department was acting on behalf of the government for this purpose only as an agent, and the constructive work itself was not necessarily of a military character, although intended for the military purposes of an encampment character.

In the present case, martial law has not been proclaimed, all the courts of the country are open, the field of actual war is thousands of miles removed from this district, and peace prevails wholly within the territorial jurisdiction of the United States. There is military preparation there, but no military conflict.

Furthermore, upon consideration of the Gerlach Case, the captain of the ship would, if necessary, under general maritime law, have been authorized to require the services of Gerlach to save the ship, for such service as he could reasonably perform. In exigencies threatening the destruction of a ship, every one on board is subject to the master's discipline and orders, and must obey; and if the exigency requires it, the vessel being within the area of submarine menace, and a watch being necessary for its preservation, the master in command of the vessel might have required the services of Gerlach, and have punished him for disobedience.

It appears, however, from the report of the case, that he was not punished for these reasons, but he was undertaken to be tried by a court-martial, and was punished as a person accompanying or serving with the armies of the United States, in the field, upon the ground that the words "in the field" do not refer to land only, but to any place, on land or water, apart from permanent cantonments or fortifications, where military operations are being conducted; that in this case Gerlach was on an army transport and peril from submarines existed when he refused to stand watch; that the captain in charge of the vessel had, in the opinion of the court, the right to call upon all persons on board, to protect the transport in any way that seemed best, in view of the danger. As to this last, that would seem to be entirely the case that the captain of the transport had the right to call upon all persons on board to protect the transport in any way that would seem best, in view of the danger; but that would not follow from the fact that Gerlach was subject to the Articles of War, but from the general maritime law.

The circumstances in the Gerlach Case are very much stronger than the present, but even in that case, as a matter of reasoning, this court is not prepared to say that it would regard the reasoning or the result of that case as controlling.

Under all the circumstances of the present case, it appears to the court that the applicant, William E. Mikell, is not a person serving

with the armies of the United States "in the field," within the terms and scope of the act of August 29, 1916; nor is he subject to trial by court-martial for the crime that he is alleged to have committed. That crime is one under the laws of the United States, for which he could be tried in the civil tribunals of the United States, and there is no reason why he should not be there tried.

It is therefore ordered and adjudged that the return to the rule to show cause in this case is insufficient, and it is overruled. It is further ordered and adjudged that a writ of peremptory habeas corpus do forthwith issue from this court, directing the respondent Maj. F. H. Hines to have and produce the body of William E. Mikell before this court, in Charleston, at the United States courthouse, on the 4th day of November, 1918, at 12 m., then to be released and discharged from military confinement without day, unless good cause be on that date and time to the contrary shown to the court.